# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA
### NEW ORLEANS DIVISION

**SONYA DENISE WATTS and GEORGE LEWIS WATTS,**
**Individually and as Parents on Behalf of**
**T.L.W., a Minor Child**

                                           *

       **PLAINTIFF,**

**vs.**                               *        **CIVIL ACTION NO.**

**BP EXPLORATION & PRODUCTION,**    *
    **INC., A DELAWARE CORPORATION,**
**BP AMERICA PRODUCTION CO.,**      *        **JUDGE: BARBIER**
    A DELAWARE CORPORATION,
**TRANSOCEAN HOLDINGS, LLC.,**      *        **MAG. JUDGE CURRAULT**
    A DELAWARE CORPORATION,
**TRANSOCEAN DEEPWATER, INC.,**     *
    A DELAWARE CORPORATION,
**TRANSOCEAN OFFSHORE**          *
    **DEEPWATER DRILLING, INC.,**
    A DELAWARE CORPORATION,      *
**HALLIBURTON ENERGY SERVICES,**
    **INC., A DELAWARE CORPORATION**   *

            **DEFENDANTS.**

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, SONYA DENISE WATTS, Individually on her own behalf as a Parent, and GEORGE LEWIS WATTS, Individually on his own behalf as a Parent, on Behalf of T.L.W., a Minor Child  (collectively "Plaintiffs"), by and through undersigned counsel, hereby brings this cause of action against BP EXPLORATION & PRODUCTION, INC. ("BP Exploration"), BP AMERICA DEEPWATER, INC. ("Transocean Deepwater"), TRANSOCEAN OFFSHORE DEEPWATER PRODUCTION COMPANY ("BP America"), TRANSOCEAN HOLDINGS,

LLC ("Transocean Holdings"), TRANSOCEAN DRILLING INC. ("Transocean Offshore"), and

HALLIBURTON ENERGY SERVICES, INC. ("Halliburton") and alleges:


## INTRODUCTION OF PARTIES

1. This is an action arising out of injuries, endured by T.L.W., a minor ("Child Plaintiff") during his life, subsequently causing permanent injuries to the Child Plaintiff, as a result of exposure to toxic substances due to the BP *Deepwater Horizon* Oil Spill on or about April 20, 2010 ("BP Oil Spill").

2. At all times relevant to this action, Plaintiffs SONYA DENISE WATTS ("Mother of Child Plaintiff") and GEORGE LEWIS WATTS ("Father of Child Plaintiff") (collectively "Parents" or Plaintiffs") are individuals residing in Greene County, Mississippi and are *sui juris*.

3. At all times relevant to this action, Child Plaintiff was a citizen and resident of Greene County, MS, and is currently a Minor residing in Greene County, Mississippi.

4. Child Plaintiff brings this action by and through the undersigned counsel and alongside his Parents who bring this action on his behalf.

5. Plaintiffs bring this action as individuals seeking relief for Child Plaintiff, and for each Plaintiff respectively for his or her own losses as a Parent of Child Plaintiff.

### *BP Defendants*

6. Defendants BP Exploration and BP America (collectively "BP Defendants") are Delaware corporations with their principal places of business in Houston, Texas.

7. BP Exploration was a leaseholder and performed oil exploration, drilling, and production-related operations in the Gulf of Mexico, including the Mississippi Canyon Block 252 ("Macondo Well") where the oil spill originated.

2

8.  The U.S. Coast Guard designated BP Exploration as a "responsible party" of the oil spill.

9.  At all times relevant to this action, BP Exploration purposely availed itself of the Court's personal jurisdiction by performing various acts that were related to the BP Oil Spill including:

   i.   Managing clean-up and/or response activities in or around the shores of Alabama, Louisiana, Mississippi, Florida, and Texas (collectively "Gulf States");

   ii.  Pumping crude oil during the spill that polluted the coasts of the Gulf States, including Mississippi;

   iii. Directing and participating with Unified Command, which contracted with various clean-up crew companies throughout the Gulf States;

   iv.  Engaging in commerce by purchasing, distributing, and supplying goods and services to Gulf residents that include petroleum products, dispersants, as well as other supplies and services necessary for various response clean-up activities; and

   v.   Registering to do business in, doing business in , and maintaining a registered agent in Louisiana and Mississippi.

10. BP America was a party to the drilling contract with Transocean Holdings for the drilling of the Macondo Well.

11. The U.S. Coast Guard designated BP America as a "responsible party" of the oil spill.

12. At all times relevant to this action, BP America purposely availed itself of the Court's personal jurisdiction by performing various acts that were related to the BP Oil Spill including:

   i.   Managing clean-up and/or response activities in or around the Gulf States;

   ii.  Pumping crude oil during the spill that polluted the coasts of the Gulf States, including Mississippi;

    iii.    Directing and participating with Unified Command, which contracted with various clean-up crew companies through the Gulf States;

    iv.    Engaging in commerce by purchasing, distributing, and supplying goods and services to Gulf residents that include petroleum products, dispersants, as well as other supplies and services necessary for various response clean-up activities; and

    v.    Registering to do business in, doing business in, and maintaining a registered agent in Louisiana and Mississippi.

*** Transocean Defendants ***

13. Defendants Transocean Holdings, Transocean Deepwater, and Transocean Offshore (collectively "Transocean Defendants") are Delaware corporations or entities with their principal places of business in Houston, Texas.

14. At all times relevant to this action, Transocean Defendants purposely availed themselves of the Court's personal jurisdiction by performing various acts that were related to the BP Oil Spill, including:

    i.    Engaging in clean-up and/or response activities in or around the Gulf States;

    ii.    Manning and guiding the Deepwater Horizon Rig ("DHR"), which exploded while pumping crude oil, resulting in the mass discharge and prolonged seepage of crude oil throughout the Gulf States' coasts, including Alabama;

    iii.    Directing and participating with Unified Command, which contracted with various clean-up crew companies through the Gulf States;

    iv.    Engaging in commerce by purchasing, distributing, and supplying goods and services to Gulf residents that include petroleum products, dispersants, as well as other supplies and services necessary for various response clean-up activities; and

    v.     Committing a tortious act in Mississippi; and

    vi.    Registering to do business in, doing business in, and maintaining a registered agent in Louisiana and doing business in Mississippi.

### *Halliburton*

15. Defendant Halliburton is a Delaware corporation with its principal place of business in Houston, Texas.

16. Defendant Halliburton's division Sperry Drilling Services (formerly Sperry Drilling Services) was responsible for mudlogging personnel and equipment on the *Deepwater Horizon*, including downhole drilling tools.  Sperry mudlogging personnel were jointly responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations. "Halliburton" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

17. At all times relevant to this action, Halliburton purposely availed itself of the Court's personal jurisdiction by performing various acts related to the BP Oil Spill including:

    i.     Being responsible for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo Well.  At and before the time of the blowout, Halliburton was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons like gas and oil.

    ii.    Registering to do business in Mississippi, doing business in Mississippi, and maintaining a registered agent in Mississippi.

### JURISDICTION AND VENUE

18. This is an action in excess of $75,000, exclusive of interest, costs, and attorney's fees.

19. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity exists among the parties.

20. Alternatively, in the event this Court lacks jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction pursuant to 43 U.S.C. § 1349(b)(1), which provides, in relevant part, that "district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals."

21. Furthermore, in the event this Court lacks jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) and 43 U.S.C. § 1349(b)(1), this Court has jurisdiction pursuant to 28 U.S.C. § 1333, including the Admiralty Extension Act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United States to "cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land."

22. The causes of action in this Complaint arise under the general maritime laws of the United States and/or the laws of Mississippi.

23. Notwithstanding the above, the most appropriate venue in accordance with 28 U.S.C. §1391 is the Southern District of Mississippi, as (i) Child Plaintiff was born and exposed in the Southern District of Mississippi; (ii) Child Plaintiff and the Plaintiffs currently live in the Southern District of Mississippi; and (iii) Child Plaintiff most relevant witnesses and evidence is located in the Southern District of Mississippi. Considering the relative ease of access to sources of proof, the ability to secure the attendance of witnesses, and the ability to minimize the costs of

witnesses, the appropriate venue for this cause of action is the Southern District of Mississippi. Pursuant to 28 U.S.C. §1404 (a) and the procedure listed in the B3 Case Management Order issued by this Court on February 21, 2021,[1] Plaintiffs may seek to have this matter transferred to the appropriate venue in the Southern District of Mississippi.

24. All conditions precedent to the institution of this action have been satisfied or otherwise excused.

## GENERAL FACTS

25. All injuries detailed arise from the same transaction and/or occurrence relating to the BP Oil Spill, *Deepwater Horizon* explosion, and subsequent oil spill-related events.

26. Plaintiffs hereby reference, incorporate, and adopt all findings of fact detailed in *Findings of Fact and Conclusions of Law* ("Phase One Findings"), MDL No. 2179, Rec. Doc. 13355, 21 F.Supp.3d 657 (E.D. La. 2014).

27. Specifically, in Phase One, the court ascertained the facts and considered evidence as to all Defendants' negligence and/or liability surrounding the blowout and explosion of the *Deepwater Horizon* on April 20, 2010.

28. After hearing the evidence, Judge Barbier found that all Defendants were each liable under general maritime law for the blowout, explosion, and oil spill. *Id.* at 746-47, 757.

29. Judge Barbier further found that the BP Defendants had acted with gross negligence and willful misconduct; the Transocean Defendants' conduct was negligent; and Halliburton's conduct was negligent. Fault was apportioned as follows: BP Defendants: 67%, Transocean Defendants: 30%, and Halliburton: 3%. *Id.* at 757.

---

[1] *See* Rec. Doc. 26924.

30. There was a full and fair opportunity to litigate the aforementioned liability, liability was actually litigated, all Defendants were parties and/or in privity with a party, and resolution of those issues was necessary for Judge Barbier's Phase One Findings.

31. BP Exploration leased the *Deepwater Horizon*, a vessel, to drill exploratory wells at the Macondo prospect site.  As the operator and primary leaseholder, BP's responsibilities included assessing the geology of the site, engineering the well design, obtaining regulatory approvals for well operations, retaining and overseeing the project's contractors, and working on various aspects of the well and drilling operations.

32. On or about December 9, 1998, predecessors to all BP Defendants and all Transocean Defendants entered into a contract for the construction, use, and operation of the *Deepwater Horizon*.

33. BP America contracted with Transocean Holdings to drill the Macondo Well.

34. Halliburton manufactured a nitrogen foam cement slurry mixture ("Cement Mixture") to provide cementing and mudlogging services for the *Deepwater Horizon*.

**BP Oil Spill**
Deepwater Horizon

35. On April 20, 2010, workers on the *Deepwater Horizon* oil rig lost control of the Macondo Well just after the final cementing work was completed.  During the cementing work, an explosion occurred on the *Deepwater Horizon*, and it caught fire.

36. The explosion and fire caused the deaths of 11 people and at least 17 others were injured.

37. The explosions and/or fire should have triggered the automatic function on the vessel's blowout preventer ("BOP"), however, that function failed, or the BOP failed to shut in the well.

38. After burning for two days, the vessel sank to the ocean floor.

39. The *Deepwater Horizon* was connected to the wellhead at the seafloor by a 5,000-foot pipe called a riser and, as the vessel sank, it pulled the riser down with it, bending and breaking the pipe before finally tearing away from it completely. The riser, bent into a crooked shape underwater, extended 1,500 feet above the seabed and then buckled back down. Oil flowed out from the open end of the riser, as well as through two breaks along its length.

40. Millions of gallons of oil discharged into the Gulf of Mexico over the next 87 days.

41. Finally, after multiple unsuccessful attempts, the well was capped and oil discharge was halted on July 15, 2010, and by mid-September, it was permanently sealed with cement.

42. While crude oil was believed to be discharged before the *Deepwater Horizon* platform sank on or about April 22, 2010, the rate of discharge is believed to have increased once the *Deepwater Horizon* sank to the ocean floor.

43. After the explosion and sinking of the *Deepwater Horizon*, BP Defendants attempted to downplay and/or conceal the severity of the BP Oil Spill. Its initial leak estimate of 1,000 barrels of oil per day was found by government investigators to be a fraction of its measured leakage, of 50,000 barrels per day. Moreover, BP Defendants did not provide complete and timely announcements and warnings about the severity, forecast, and trajectory of the BP Oil Spill.

44. On or about June 20, 2010, then-Congressman Edward Markey of Massachusetts released an internal BP document showing that the company's own analysis had revealed the actual rate of oil leakage to be 4,200,000 gallons per day and that the total oil leakage could reach 100,000 barrels.

45. The flow of oil continued unabated and the oil made landfall on or about April 30, 2010.

46. The BP Oil Spill created an oil slick with a range of thousands of miles and thick voluminous plumes of oil in the deep waters within the Gulf of Mexico.  The oil spill caused these slicks and plumes to form.

47. The oil infiltrated and continues to infiltrate the delicate wetlands and intertidal zones that protect the coasts of Louisiana, Mississippi, Alabama, Texas, and Florida.

48. An estimated 200 million gallons of crude oil infiltrated sensitive coastland and intertidal ecosystems.

49. After the Oil Spill, the United States Coast Guard formally and/or informally designated, *inter alia*, BP Defendants and the Transocean Defendants as "responsible parties" under the Oil Pollution Act ("OPA").

50. Following an exhaustive investigation into the cause of this enormous disaster, a White House commission faulted the BP Defendants and its partners for a series of cost-cutting measures that led to insufficient safety systems. In November 2012, BP Defendants pled guilty to 11 counts of manslaughter and one felony count of lying to Congress[2], for which the oil giant agreed to pay billions in criminal fines, penalties and restitution.

51. The leaked crude oil contains many highly toxic and hazardous chemicals that can damage nearly every system in the human body.

---

[2] "[T]he felony obstruction of Congress charge reflects the fact that the defendant's criminal conduct extended beyond the events surrounding the blowout itself to the defendant's untruthful post-spill conduct in understanding the scope of the ensuing oil spill to Congress… BP, through a former vice president, withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD…On or about June 25, 2010, in a BP letter to Congressman Markey, BP's former vice president inserted language that falsely stated that BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent 'pressure data was obtained from the BOP stack.' At the time this false representation was made, BP's former vice president knew that the 100,000 BOPD figure was not first derived after subsequent pressure data had been obtained, but instead, he had been aware of a 100,000 BOPD worst case discharge since as early as on or about April 21, 2010" See Guilty Plea Agreement at 1, U.S. v. BP Exploration & Production, Inc., No. 2:12-CR-00292 (E.D. La, Nov. 15, 2012), ECF No. 2.

52. In the wake of the disaster, and pursuant to its duties and responsibilities under the OPA, BP Defendants began implementing a response and containment plan.

53. The "BP Oil Spill" includes the events, actions, inactions, and omissions leading up to, during, and subsequent to:

    i.    The blowout of the Macondo Well, which was drilled by the Transocean Marianas and DHR on the Outer Continental Shelf in the Gulf of Mexico, approximately 130 miles southeast of New Orleans, Louisiana;

    ii.    The explosions and fire on board the DHR on or about April 20, 2010;

    iii.    The sinking of the DHR on or about April 22, 2010;

    iv.    The release of oil, other hydrocarbons, and other toxic substances from the Macondo Well and/or the DHR and its appurtenances;

    v.    The efforts to contain the Macondo Well; and

    vi.    Response activities performed by clean-up workers under the direction of Unified Command.

54. BP Defendants were the operators of the Macondo Well under federal regulations of the Minerals Management Service ("MMS"); therefore, they were the entities the lessee(s) designated as having control or management of operations.

55. As operators and primary leaseholders, BP Defendants were responsible for, but not limited to, assessing the geology of the site, engineering the well design, obtaining regulatory approvals for well operations, retaining, and overseeing the projects contractors, and working on various aspects of the well and drilling operations.

56. In the aftermath of the BP Oil Spill, the BP Defendants hired various incentivized consultants and contractors that generated "scientific" findings and testing biased in favor of the BP

Defendants. These include BP's environmental,[3] Industrial Hygiene,[4] and litigation support contractors that supervised or assisted in the creation of the monitoring and sampling data.

57. BP Defendants incentivized contractors to set detection and reporting limits for chemicals of concern at high levels (*i.e.* screening levels), and any detection of chemicals that fell below that selected limit were often recorded as a zero value or non-detection. The Industrial Hygiene data collection plans were designed or contemplated, in part, to limit the BP Defendants' liability in future litigation and manufacture scientific doubt about the harmful effects of the BP Oil Spill. Scientists attempting to work with this data years later to create peer-reviewed and neutral science have described the BP Defendants contractor created testing as "censored" data.[5]

---

[3] BP hired Exponent during the Spill to collect and oversee the environmental and chemical dispersant data gathering, as well as other services. As stated by Dr. David Michaels—PhD, MPH, epidemiologist and professor at George Washington University—"[g]ive Exponent an A+ for manufactured uncertainty." Michaels, D. (2008). *Doubt is their product: How industry scientists manufacture uncertainty and threaten your health* (p. 138). Oxford University Press. "Having cut their teeth manufacturing uncertainty for Big Tobacco, scientists at . . . Exponent, Inc., and other consulting firms now battle the regulatory agencies on behalf of manufacturers of benzene, beryllium, chromium, MTBH (methyl tertiary-butyl ether), perchlorates, phthalates, and virtually every other toxic chemical in the news today." *Id*. at 46. "They profit by helping corporations minimize public health and environmental protection and fight claims of injury and illness." *Id*.

[4] BP's lead Industrial Hygiene contractor during the Oil Spill—Center for Toxicology and Environmental Health ("CTEH")—had a "vested interest in finding a clean bill of health to satisfy its corporate employer" according to experts. *See Record of BP's Gulf Worker-testing firm raises conflict-of-interest questions*. The New York Times. Retrieved July 21, 2022, from https://archive.nytimes.com/www.nytimes.com/gwire/2010/06/18/18greenwire-record-of-bps-gulf-worker-testing-firm-raises-84788.html. CTEH was later faulted for "improper sample collection procedures, and a 2008 Environmental Protection Agency audit similarly found deficiencies in the company's air-monitoring at the site of a Tennessee coal ash spill." Chase Woodruff, C. N. S. 4. (2020, September 4). *Oil companies rely on controversial firm to rebut Colorado Health Study*. Colorado Newsline. Retrieved July 21, 2022, from https://coloradonewsline.com/2020/09/04/oil-companies-rely-on-controversial-firm-to-rebut-colorado-health-study/. "This firm also performed toxicity testing on Chinese drywall and found no health risks even though other independent tests had." Button, G. (2016). *In Disaster culture knowledge and uncertainty in the wake of human and environmental catastrophe* (p. 233). Taylor and Francis.

[5] *See* Huynh T, Ramachandran G, Banerjee S, Monteiro J, Stenzel M, Sandler DP *et al*., *Comparison of methods for analyzing left-censored occupational exposure data. Ann Occup Hyg* 2014; 58: 1126–1142 ("Over 150,000 personal exposure measurements for an array of contaminants were collected; however, a substantial number of these measurements was below the limits of detection (LOD) reported by the analytic laboratories, or left-censored (Type I censoring) . . . Despite the large number of measurements, in many cases the number of available measurements for specific exposure groups is small (e.g., <10) and many exposure groups have a high percentage of censored data (50–100% for many groups). In addition, these measurements are often marked by high variability, probably due to the non-routine nature of some of the activities and changes in these activities over time.") Scientists with the National Institute of Environmental Health and National Institutes of Health noted that approximately 95% of the samples for Total Hydrocarbons and BTEX (benzene, toluene, ethylene, and xylene) were "censored" due to the limits of detection

DW Toxic Chemicals

58. For purposes of this action, crude oil, hydrocarbons, benzene, and/or products containing benzene, which are all associated with the clean-up efforts from the Macondo Well and the *Deepwater Horizon* explosion, are collectively known as "DW Toxic Chemicals."

59. After the disaster, BP Defendants began implementing a disaster response plan to prevent oil from escaping the blown out well, manually contain the oil, and disperse oil in the water using chemical dispersants.

60. BP Defendants' response plan included the use of chemical dispersants, specifically Corexit, to break down the oil into finely dispersed droplets.

61. Upon information and belief, immediately after the *Deepwater Horizon* disaster, on or about April 23, 2010, BP began the subsea and aerial application of chemical dispersants to the oil slicks and sheens on the surface of the Gulf of Mexico.

62. On or about May 19, 2010, the U.S. Environmental Protection Agency ("EPA") Administrator directed BP Defendants within 24 hours of issuance to identify and use chemical dispersants that are less toxic than the Corexit dispersants.

63. On May 20, 2010, BP Defendants objected to changing dispersants and notified the EPA that it would continue using Corexit.

64. BP Defendants' use of Corexit skyrocketed: on May 22, 2010, BP used 45,000 gallons and on May 23, 2010, it used 70,000 gallons.

65. On May 26, 2010, the EPA directed BP Defendants to reduce the overall use of Corexit by 75%. May 26, 2010, EPA directive also required BP Defendants to eliminate the use of

---

set by contracted laboratories. *See* RK Kwok, LS Engel, AK Miller, et al., *The GuLF STUDY: a Prospective Study of Persons Involved in the Deepwater Horizon Oil Spill Response and Clean-up*, Environ Health Perspect., 125 (2017), pp. 570-78.

chemical dispersants on the surface except in rare cases where an exemption is sought in writing from and approved by the USCG Federal On-Scene Coordinator in charge of the Response.

66. Since May 26, 2010, EPA directive, BP Defendants sought more than 40 exemption requests to use chemical dispersants on the surface and subsea in the Gulf of Mexico.

67. The dispersant-treated and raw crude oil carried significant public health risks because it contained many highly toxic chemicals that can damage various systems in the body.

68. Specifically, crude oil contains benzene and other volatile organic compounds such as ethylbenzene, toluene, xylene, naphthalene, polycyclic aromatic hydrocarbons ("PAHs"), diesel fumes, and heavy metals such as aluminum, cadmium, nickel, lead, and zinc.

69. The aforementioned organic compounds cause severe harm to human health.

70. Chemicals such as benzene, PAHs, and many other chemicals in crude oil are toxic and move from the oil into the air. Once airborne, these chemicals and fugitive emissions, with pungent petroleum like odors, can blow over the ocean for miles, reaching communities far from the location of the spill.

71. According to the Agency for Toxic Substances and Disease Registry, which is part of the U.S. Department of Health and Human Services, benzene is a known mutagen and carcinogen. Benzene in crude oil can cause a variety of health complications, including ventricular fibrillation, congestive gastritis, toxic gastritis, pyloric stenosis, myalgia, kidney damage, skin irritation and burns, swelling and edema, vascular congestion in the brain, and lethal central nervous system depression.

72. A 2007 Centers for Disease Control review of benzene toxicity concluded that there is substantial evidence that benzene causes leukemia, chromosomal abnormalities in

lymphocytes and bone marrow cells, damage to the immune system, and abnormal development of blood cells. Long term, low-level oral and inhalation exposures to benzene have also caused peripheral nervous system abnormalities, distal neuropathy, difficulty sleeping, memory loss, and cancer.

73. As a result of the explosion of the DHR, DW Toxic Chemicals and many highly toxic dispersants were released from the Macondo Well and reached the shores of the Gulf States.

Toxic Dispersants

74. Aside from DW Toxic Chemicals, BP Defendants purchased highly noxious chemical dispersants from Nalco, a chemical manufacturer, and/or its subsidiaries and sprayed them as part of the response activities performed in the clean-up efforts. These dispersants manufactured by Nalco include Corexit EC9500A and Corexit EC9527A.

75. The Corexit products contain hazardous substances, is harmful to human health, and dermal exposure, inhalation, and ingestion should be avoided.

76. Corexit EC9500 is an eye and skin irritant and may irritate the respiratory tract if inhaled, for example, it may cause chemical pneumonia.

77. Corexit EC9527A contains 2-butoxyethanol, also known as EGBE. Repeated or excessive exposure to EGBE may cause injury to red blood cells, the kidneys, and the liver. EGBE may be carcinogenic to humans. It is an eye, nose, and throat irritant that causes nausea, vomiting, diarrhea, and abdominal pain. Exposure to EGBE can also cause headaches, dizziness, lightheadedness, and unconsciousness.

78. All of the aforementioned harmful dispersants, Corexit EC9500A and Corexit EC9527A, are hereinafter collectively referred to as "Toxic Dispersants."

79. According to the BP *Deepwater Horizon Gulf Study*, funded by BP Defendants themselves, upstream petrochemical workers have reported experiencing leukemia, multiple myeloma, melanoma, and esophageal adenocarcinoma.

80. On or about April 23, 2010, BP Defendants and/or their agents began applying Toxic Dispersants to the oil on the surface of the Gulf of Mexico. Toxic Dispersants were sprayed onto the ocean surface from aircrafts that flew over areas with oil and dispensed chemicals from cargo holds, fountain type jets on the decks of boats, and smaller vessels onto the surface of the water. Toxic Dispersants were also injected immediately below the surface of the water from vessels, deep below the surface of the ocean, and even sprayed by hand. These Toxic Dispersants were sprayed day and night, exposing anyone near the coastal areas, despite warnings not to.

81. According to BP's Gulf Study which was based on the health effects of zone residents and clean-up workers around the BP Oil Spill, the toxic effects on the human body are 52 times more toxic when Corexit and crude oil are combined.

82. The dispersants used by BP Defendants are known to cause, *inter alia*:  headaches; nausea; vomiting; diarrhea; abdominal pains; dizziness; chest pains and tightness; irritation of the skin, eyes, nose, throat, and lungs; breathing difficulties and respiratory system damage; asthma attacks; hypertension; damage to the liver and kidneys; central nervous system depression; neurotoxic effects; damage to red blood cells; genetic damage and mutations; reproductive and developmental damage; immune system damage; cardiac arrhythmia; cardiovascular damage; and increased severity of the chronic obstructive pulmonary disease.

83. BP Defendants and its contractors have used more than 1.8 million gallons of toxic dispersants in the Gulf of Mexico in connection with the  BP Oil Spill.

**Child Plaintiff's Exposure**

84. Child Plaintiff was exposed to toxic dispersants in and around Mississippi specifically in and around Gulfport and Biloxi MS.

85. Child Plaintiff was exposed due to:

      i. Conducting recreational activities including beach visits and fishing in the areas located in the zone.

      ii. Ingesting contaminated seafood from the waters of the Gulf of Mexico.

86. Child Plaintiff was exposed through inhalation, ingestion, and dermal contact due to the aforesaid pathways of exposure.

87. Plaintiffs and Child Plaintiff were neither warned that personal protective equipment ("PPE") was needed while conducting any of the aforesaid activities nor were they warned to avoid the water or any location at any time. Moreover, the Plaintiffs and  the Child Plaintiff were never warned that the seafood was or may have been contaminated.

**CAUSES OF ACTION**

**COUNT I – NEGLIGENCE**
**(against all Defendants)**

88. Plaintiffs' reallege and incorporate by reference the allegations contained in paragraphs 1 – 87.

89. At all times relevant to this action, Defendants participated in drilling operations onboard the *Deepwater Horizon* in the Gulf of Mexico.

90. Defendants owed duties of ordinary and reasonable care to the Child Plaintiff in connection with the drilling operations of the *Deepwater Horizon* and maintenance of the vessel, its appurtenances, and equipment.

91.  Defendants owed duties of ordinary and reasonable care to the Child Plaintiff to guard against and/or prevent the risk of an oil spill.

92. Defendants were owed a duty to warn Plaintiffs, as the Parents of the Child Plaintiff of non-obvious dangers, such as chemical dispersants infiltrating beaches, marine animals, drinking water, intercoastal waterways, tributaries, and other areas along the greater Gulf Coast.

93. Defendants further owed duties to those who might foreseeably be harmed, including the Child Plaintiff, to exercise due care in the operation, maintenance, handling, design, implementation, and execution of the relief and recovery measures.

94. At all times material to this action, Defendants breached their duties of ordinary and reasonable care to the Child Plaintiff in connection with the drilling operations of the *Deepwater Horizon* and maintenance of the vessel, its appurtenances and equipment and additionally owed and breached duties to the Child Plaintiff to guard against and/or prevent the risk of an oil spill.

95. Additionally, Defendants breached a duty to the Child Plaintiff, including persons who might foreseeably be harmed, to exercise due care in the planning, operation, maintenance, handling, design, implementation, and execution of the oil spill relief and recovery measures.

96. Defendants failed to warn and/or provide sufficient warnings, including recommended use of PPE, to Plaintiffs, as the Parents of the Child Plaintiff of the non-obvious dangers and heightened risks associated with the oil spill and subsequent cleanups, such as chemical dispersants infiltrating beaches, seafood, drinking water, intercoastal waterways, tributaries, and other areas along the greater Gulf Coast.

97. Furthermore, Defendants knew or should have known:

     i.   Crude oil contains hazardous chemicals that are deleterious to human health and the environment;

ii.   The chemical and toxic dispersants used contain hazardous chemicals that are deleterious to human health and the environment;

iii.  Individuals, such as Plaintiffs, in their capacity as the Parents of the Child Plaintiff should have been made aware of the non-obvious dangers of the harmful effects of crude oil and/or chemical dispersants; and

iv.   Individuals, such as the Child Plaintiff, should wear PPE and/or respirators when in close proximity to the crude oil and/or chemical dispersants.

98. The blowout and explosions on the *Deepwater Horizon*, its sinking, and the resulting oil spill were caused by the joint and concurrent negligence of all Defendants.

99. On September 4th, 2014, Judge Barbier of the United States District Court for the Eastern District of Louisiana issued findings of facts and conclusions of law and found that the BP Defendants' conduct was reckless, the Transocean Defendants' conduct was negligent, and Halliburton's conduct was negligent and that each were liable under general maritime law for the blowout, explosion, and subsequent oil spill from the Deepwater Horizon Incident. *See In re Oil Spill*, 21 F.Supp.3d 657, 757 (E.D. La. 2014).

100.  The damages sustained by the Child Plaintiff as a result of the oil spill are apportioned as such:  BP Defendants 67% liable, Transocean Defendants 30% liable, and Halliburton 3% liable.

101.  In addition to Judge Barbier's finding and conclusions of facts and law, Defendants breached their duties by:

i.    Failing to warn Plaintiffs , as the Parents of the Child Plaintiff of the harmful effects toxic and chemical dispersants, including benzene, as it comes into contact with the Child Plaintiff.

    ii.    Failing to properly warn Plaintiffs, as the Parents of the Child Plaintiff to avoid exposure to hazardous substances encountered in connection with the oil spill and clean up;

    iii.    Failing to maintain, monitor, and operate the *Deepwater Horizon* in a reasonably safe manner so as to avoid harm to foreseeable individuals, such as the Child Plaintiff harmed from reproductive and/or in-utero exposure, and/or infant exposure, and/or early childhood exposure;

    iv.    Failing to inspect the BOP to ensure it was not faulty and/or would not fail during use to avoid harm to foreseeable individuals, such as the Child Plaintiff harmed from reproductive and/or in-utero exposure, and/or infant exposure, and/or early childhood exposure; and/or

    v.    Failing to otherwise exercise reasonable care in the planning, operation, maintenance, handling, design, implementation, and execution of the cleanup/relief and recovery measures to avoid harm to foreseeable individuals, such as the Child Plaintiff.

102.    Child Plaintiff was exposed and came into contact with oil, other hydrocarbons, chemical dispersants, and/or other substances through the eyes, nose, mouth, skin, and/or airways.

103.    As a direct and proximate cause of Defendants' negligence, Child Plaintiff was exposed to the aforementioned chemical dispersants and/or toxins and suffered, and continues to suffer, significant injuries including  cancer, skin cancer, Cutaneous T-Cell Lymphoma, and suffers physical pain, mental anguish, loss of enjoyment of life, loss of work, disability, disfigurement, incurred medical and travel expenses in the care and treatment of his injuries, suffered physical handicap and his ability to take care of himself and his family has been impaired, he suffered, lost and continues to remain deprived of precious moments amounting to years of childhood.

These injuries were foreseeable and a natural and probable consequence of the Defendants' negligence.

104.    Furthermore, as a direct and proximate cause of Defendants' negligence, Child Plaintiff's exposure to the proven hazardous substances was greater than normal background levels and, therefore, significantly increase Child Plaintiff's risk of contracting and/or developing a serious latent disease.  A monitoring procedure exists that makes early detection of the disease possible, the prescribed monitoring regime is different from that normally recommended in the absence of the exposures, and the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

WHEREFORE, Plaintiffs hereby demand judgment against all Defendants as follows:

    i.    Past and future medical expenses including the cost of medical monitoring;

    ii.    Past and future travel expenses for medical care and other treatment;

    iii.    Compensatory damages;

    iv.    Loss of society and consortium;

    v.    Loss of future earning capacity Child Plaintiff;

    vi.    Lost earnings of each Parent in caring for the Child Plaintiff;

    vii.    Loss of enjoyment of a healthy child, emotional losses, pain, and suffering;

    viii.    Pain and suffering, past, present, and future;

    ix.    Pre-judgment and post-judgment interest;

    x.    Attorneys' fees and costs of litigation

    xi.    Any and all supplemental Mississippi remedies available to Plaintiffs; and

    (x)    Any other relief this Court deems just and proper.

## COUNT II – GROSS NEGLIGENCE
### (against BP Defendants)

105.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 –

87.

106.    BP Defendants owed duties of ordinary and reasonable care to the Child Plaintiff in

connection with the drilling operations of the *Deepwater Horizon* and the maintenance of the

vessel, its appurtenances, and equipment.

107.    BP Defendants also owed duties of ordinary and reasonable care to the Child Plaintiff to

guard against and/or prevent the risk of an oil spill.

108.    BP Defendants also owed a duty to warn Plaintiffs, as the Parents of the Child Plaintiff  of

non-obvious dangers, such as chemical dispersants infiltrating beaches, seafood, drinking

water, intercoastal waterways, tributaries, and other areas along the greater Gulf Coast.

109.    BP Defendants further owed duties to those who might foreseeably be harmed, including

the Child Plaintiff, to exercise due care in the planning, operation, maintenance, handling,

design, implementation, and execution of the relief and recovery measures.

110.    Furthermore, BP Defendants knew or should have known:

i.    Crude oil contains hazardous chemicals that are deleterious to human health and the

environment;

ii.    The toxic and chemical dispersants used contain hazardous chemicals that are

deleterious to human health and the environment;

iii.    Plaintiffs,  as the Parents of the Child Plaintiff should have been made aware of the

non-obvious dangers of the harmful effects of crude oil and/or chemical dispersants;

and

    iv.    The Child Plaintiff should wear PPE and respirators when in close proximity to the crude oil and/or chemical dispersants.

    v.    Failing to maintain, monitor, and operate the *Deepwater Horizon* in a reasonably safe manner so as to avoid harm to foreseeable individuals, such the Child Plaintiff causing reproductive and/or in-utero exposure, and/or infant exposure, and/or early childhood exposure;

    vi.    Failing to inspect the BOP to ensure it was not faulty and/or would not fail during use would cause harm to foreseeable individuals, such as the Child Plaintiff harmed from reproductive and/or in-utero exposure, and/or infant exposure, and/or early childhood exposure; and/or

111.    BP Defendants additionally focused primarily on profit while disregarding the public's and environment's health and safety while undertaking ultra-hazardous activities on the *Deepwater Horizon*. BP Defendants' conduct was reckless and/or willful and wanton and disregarded the rights and/or safety of Mississippi residents and others of the Gulf States, such as the Child Plaintiff, by:

    i.    Performing a critical well pressure test with untrained and unqualified personnel and ignoring and/or misinterpreting abnormal "red flag" pressure test results;

    ii.    Using a well design with too few barriers to gas flow;

    iii.    Failing to use a sufficient number of centralizers to prevent channeling during the cement process;

    iv.    Failing to run a bottoms-up circulation of the drilling mud prior to beginning the cement job;

    v.    Failing to run a cement bond log to evaluate the integrity of the cement job;

vi.    Failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well;

vii.    Using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes;

viii.    Grossly inadequate maintenance, and reckless and improper operation and use of the BOP appurtenant;

ix.    Failing to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout;

x.    Failing to ensure that adequate safeguards, protocols, procedures, and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill;

xi.    Failing to warn the public, such as the Plaintiffs, as Parents of the Child Plaintiff of:

i.    the harmful effects of the DW Toxic Chemicals and Toxic Dispersants;

ii.    the harmful effects of exposure to these substances; and/or

iii.    the use of proper protective clothing and respirators when in close proximity to the areas affected by the BP Oil Spill.

xii.    Failing to use reasonably safe dispersant chemicals in the attempt to respond to the oil spill;

xiii.    Willfully using Corexit despite the EPA issuing directives for BP Defendants to use less toxic dispersants than Corexit; and

xiv.    Willfully failing to comply with and/or ignoring EPA's directive to reduce the use of surface and subsurface dispersants.

112.    The Child Plaintiff was exposed and came into contact with oil, other hydrocarbons, chemical dispersants, and/or other substances through the eyes, nose, mouth, skin, and airways.

113.    The aforementioned acts and conduct by the BP Defendants were reckless and/or willful and wanton.

114.    BP Defendants knew or should have known that their reckless and/or willful and wanton conduct would foreseeably cause Child Plaintiff's injuries.

115.    As a direct and proximate cause of BP Defendants' reckless and/or willful and wanton acts, Child Plaintiff was exposed to the aforementioned chemical dispersants and/or toxins and suffered, and continues to suffer, significant injuries including cancer, skin cancer, Cutaneous T-Cell Lymphoma, and suffers physical pain, mental anguish, loss of enjoyment of life, loss of work, disability, disfigurement, incurred medical and travel expenses in the care and treatment of his injuries, suffered physical handicap and his ability to take care of himself and his family has been impaired, he suffered, lost and continues to remain deprived of precious moments amounting to years of childhood.. These injuries were foreseeable and a natural and probable consequence of BP Defendant's reckless and/or willful and wanton acts that led to the oil spill and subsequent clean-up efforts.

WHEREFORE Plaintiffs demand judgment against BP Defendants as follows:

i.    Past and future medical expenses including the cost of medical monitoring;

ii.    Past and future travel expenses for medical care and other treatment;

iii.    Compensatory damages;

iv.    Loss of society and consortium;

v.    Loss of future earning capacity of the Child Plaintiff;

vi.    Lost earnings of each Parent in caring for the Child Plaintiff;

vii.    Loss of enjoyment of a healthy child, emotional losses, pain, and suffering;

viii.    Pain and suffering, past, present, and future;

ix.    Punitive damages and/or exemplary damages;

x.    Pre-judgment and post-judgment interest;

xi.    Attorneys' fees and costs of litigation

xii.    Any and all supplemental Mississippi remedies available to Plaintiffs; and

xiii.    Any other relief this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demands trial by jury on all issues so triable.

Respectfully Submitted,

**THE DOWNS LAW GROUP, P.A.**
*Attorneys for Plaintiff*

*/s/ David Durkee_____*
**C. DAVID DURKEE**
Florida Bar No.:  998435
3250 Mary Street Ste 307
Coconut Grove, FL 33133
Telephone: (305) 444-8226
Facsimile: (305)-444-6773
Email: ddurkee@downslawgroup.com
*/s/ Alexander Blume_____*
**ALEXANDER BLUME**
Florida Bar No.:  1036944
3250 Mary Street Ste 307
Coconut Grove, FL 33133
Telephone: (305) 444-8226
Facsimile: (305)-444-6773
Email: ablume@downslawgroup.com

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing was served to all counsel of record registered to receive electronic service as attorneys of record in the Court's electronic filing system.

Dated:  May 11, 2023

/s/ David Durkee_____
**C. DAVID DURKEE**